**R. J. LEFEVERE, Appellant,**

v.

**James L. (Jabo) SEARS, et al., Appellees.**

**No. 7000.**

Court of Appeals of Texas, El Paso.

July 22, 1981.

Lynch, Chappell, Allday & Alsup, Randall Lundy, Tom C. McCall, Steven C. Kiser, Midland, for appellant.

McGowen & McGowen, R. B. Jerry McGowen, III, Roddy L. Harrison, Pecos, for appellees.

## OPINION

STEPHEN F. PRESLAR, Chief Justice.

This is a case concerning the right of possession to crops grown by the purchaser on land which was the subject of a purchase/sale contract that was never consummated. The trial Court, sitting without a jury, rendered a take nothing judgment against the Plaintiff, but rendered judgment for the intervenor for his services in harvesting the crop. We reverse the take nothing judgment and affirm the judgment for the intervenor.

R. J. Lefevere, as purchaser, and James L. Sears, as vendor, entered into purchase/sale contract for a section of farmland, with a house thereon and certain farming equipment. The contract was entered into on April 12, 1979, and was to be closed on July 12, 1979, with the exchange of a deed and payment of the purchase price of $174,000.00 upon approval of title. The parties agreed to several oral extensions of the closing date when purchaser had trouble arranging financing. On August 15, the parties signed an amendment to the contract which provided for a closing date on or before midnight of August 31. This amendment to the contract provided that, in the event the buyer failed before midnight of August 31 to pay the cash

consideration, the contract would terminate, the buyer would surrender the property, and title to all growing crops would pass to the vendor. As will be discussed later, the contract failed to close on August 31. Thereafter, the vendor entered upon the land, harvested the grain and sold it for $9,000.00. On November 30, the buyer obtained a temporary restraining order against the vendor and, during the ten days it was in effect, he harvested the cotton crop but it was not removed from the premises. The intervenor, Blackstock, was employed to do the cotton harvesting, and his intervention in this suit was ·to collect the balance due him for such work. The First National Bank of Pecos is a party to the suit because it loaned the vendor $28,000.00 on September 4, 1979, and $5,000.00 in January, 1980, secured by a lien on the crops. D. B. Hardeman Cotton, Inc., is a party to the suit because it agreed to purchase the cotton from the vendor and advanced him $50,000.00 of the purchase price.

The basic question of this case comes from the supplemental contract of August 15 with its provision that the purchaser would surrender the crops and they would become the property of the seller. The trial Court judgment is based on findings of both fact and law that this amendment converted the purchase/sale contract to one of option, and, upon the failure of the buyer to exercise his option, the seller had a mandatory obligation to accept possession of the property and the crops growing on the property as liquidated damages. With that, we are unable to agree.

 A contract for sale of real estate is an agreement which binds the purchaser to buy and the seller to sell in accordance with the terms of the contract. *Tabor v. Ragle*, 526 S.W.2d 670 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n.r.e.). The formation of the contract passes equitable title to the purchaser. *Hamon v. Allen*, 457 S.W.2d 384 (Tex.Civ.App.—Corpus Christi 1970, no writ). On the other hand, an option contract gives the optionee the *right* to elect to purchase the property at stated terms within a specified period of time, but with no

obligation to do so; no title passes at the time the option contract is formed and time is of the essence. *McCaleb v. Wyatt*, 257 S.W.2d 880 (Tex.Civ.App.—Fort Worth 1953, writ ref'd n. r. e.). The language of the contract and the amendment in this case is similar to the provisions of a contract construed by the Supreme Court in *Paramount Fire and Insurance Company v. Aetna Casualty & Surety Company*, 163 Tex. 250, 353 S.W.2d 841 (Tex.1962). The contract in the case before us has similar and stronger language making it a contract of purchase and sale. In fact, the Court found the April 12 instrument was a valid contract of sale, but that the amendment "modified" the original agreement, and "[t]he agreement of the parties was intended as an option . . . ." As noted in Tex. Jur.2d: "Options and contracts of sale constitute two separate and distinct kinds of agreement, even if they are included in the same instrument." 58 Tex.Jur.2d *Vendor and Purchaser* sec. 58 (1964), citing *Slaughter Cattle Co. v. Potter County*, 235 S.W. 295 (Tex.Civ.App.—Amarillo) *aff'd* 254 S.W. 775 (1921). But, that is not the case here because the amendment of August 15 does not create a new and different contract of option; it is entitled "Amendment to Contract" and speaks of the terms of that contract rather than terms of a new contract to be performed; it provides:

[T]HAT WHEREAS, on April 12, 1979, JAMES L. SEARS, as SELLER, entered into a contract of Purchase and Sale with R. J. LEFEVERE, as PURCHASER, whereby SEARS agreed to sell to LEFEVERE, and LEFEVERE agreed to purchase from SEARS, . . . .

The body of the amendment then recites the request for an extension by the purchaser and the agreement to the extension by the seller of such time until midnight August 31, 1979, when the seller shall pay the consideration and accept the deed and bill of sale to the land and equipment "in accordance with the terms of said contract." There is no contention that the contract is ambiguous. Therefore, looking no further than the contract and the circumstances under which it was executed, there is no

support for the trial Court's dual finding of fact and law that this was a valid option agreement whereby the seller has a "mandatory obligation to accept possession of the property and crops [growing on the property] as liquidated damages . . . ," upon the buyer's "failure to timely tender [the purchase price]." Such a provision would be necessary for an option contract, but is not present. *Gala Homes, Inc. v. Fritz*, 393 S.W.2d 409 (Tex.Civ.App.—Waco 1965, writ ref'd n. r. e.). It should also be noted that the amendment provides that in the event that the buyer fails to perform by midnight of August 31, "then the above mentioned contract between the parties, dated April 12, 1979, shall terminate and be of no further effect." Other language in the amendment should be noted: "LEFEVERE is granted until Midnight, August 31, 1979, to perform said above mentioned contract . . . ," the purchase/sale contract, not some new option contract. The conclusion is inescapable that the amendment to the contract is just that, in that it amends it to extend the time for performance and to provide a penalty or forfeiture for failure to meet that deadline.

We have concluded that the provision for forfeiture of crops is contrary to the established case law of contracts; also, since it includes the sale of goods, it is violative of the Uniform Commercial Code sec. 2.718(a). The Texas Supreme Court in *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484 (1952), pronounced the law applicable here:

> The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule. In those cases in which courts enforce stipulations of the parties as a measure of damages for the breach of covenants, the principle of just compensation is not abandoned and another principle substituted therefor. What courts really do in those cases is to permit the parties to estimate in advance the amount of damages provided they adhere to the principle of just compensation. Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:

> > '(1) An agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

> > '(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

> > '(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.'

*Stewart v. Basey* has been followed in numerous cases and remains the established law in Texas, having been restated by the Supreme Court in 1979 in the case of *Rio Grande Valley Sugar Growers v. Campesi*, (Tex.Civ.App.) 592 S.W.2d 340. *See also*: 5 Corbin on Contracts, *A Comprehensive Treatise on the Working Rules of Contract Law* sec. 1058 (1964); 5 Williston on Contracts, *A Treatise on the Law of Contracts* secs. 777, 778 (3d ed. 1961); 30 Tex.L.Rev. 752 (1952); and for a thorough comprehensive review, *see*: Wisconsin Law Review 1978 at 351, *Liquidated Damages v. Penalties: Sense or Nonsense?*

The issue of the enforceability of liquidated damages in any given case is one of law for the court to decide. *Bourland v. Huffhines*, 244 S.W. 847 (Tex.Civ.App.1922, writ dism'd); *Muller v. Light*, 538 S.W.2d 487 (Tex.Civ.App.—Austin 1976, writ ref'd n. r. e.). In our judgment, the provision for forfeiture of the crops fails by each standard set out in *Stewart v. Basey, supra.* In order to enforce the provision of forfeiture of the crops, the Court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation. *Stewart v. Basey, supra; Rio Grande Valley Sugar Growers v. Campesi, supra.* That

has not been done in this case, and, in our judgment, the provision fails in each standard.

The buyer entered into possession of the property and planted some 256 acres of irrigated cotton and 45 acres of irrigated grain. The evidence is that the cotton was worth from $100,000.00 to $110,000.00. The grain was harvested and sold for $9,000.00. The buyer had spent some $56,000.00 in growing the crops. Prospects of a crop failure were by then small and it was fairly obvious by August 15 that the crops were good; little or nothing more remained to be done in the way of cultivating and irrigating; there was the possibility of hail damage, but, otherwise, about all that remained was for the crops to mature. That this was true and the chance of the crops failing was minimal is evidenced by the fact that as early as September 4, four days after the August 31 closing date, a bank loan of $28,000.00 was obtained secured by a lien on the crops. Liquidated damages in the form of crops of a value of $109,000.00 to $119,000.00 cannot be called a reasonable forecast of just compensation for a two-weeks delay in the sale of property of the value of $174,000.00. The evidence is that the value of the land was stable and unchanging.

Another reason why the forfeiture provision cannot be enforced is that part of the property involved is machinery and equipment, which would be covered by the Texas Business and Commercial Code sec. 2.718 (Vernon 1968). Section (a) provides:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasability of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

We conclude that the last sentence is applicable to the contract before us.

This suit is not one for specific performance, nor is it one for damages for failure to perform. This suit was tried on pleadings by the buyer as Plaintiff seeking recovery of his crops or their value. He based his rights on the contract and the amendment, alleged the invalidity of the provision for forfeiture of the crops, and pled for recovery under equitable principles. The seller, Bank and cotton buyer entered a common answer as "Defendants," pleading a general denial and several specific denials by the seller only. The parties contracted as to the crops, providing in the original agreement that the buyer was authorized by the seller to commence farming operations, and then, by their amendment to the contract, they made the provision that has been above discussed as to forfeiture of the crops. We have held that provision invalid, and, on that basis, Plaintiff has made a case and is entitled to recover.

The trial Court has found that the buyer was in default and did not perform under the terms of the contract, and that the seller had performed. With those findings, we are unable to agree. To begin with, the buyer could not be in default until the August 31 deadline. All prior deadlines were waived by agreement, and all such oral agreements were merged in the written agreement setting the August 31 deadline. The cause of action is not based on non-performance, but on an invalid provision of the contract.

The amendment setting the August 31 deadline called for performance "in accordance with said contract," and said contract provided for conveyance to be made free and clear of all liens. A title policy was to be furnished and if it contained any exceptions to title unacceptable to the purchaser, they were to be cured by the seller in "a reasonable time," and if not so cured, the purchaser had his option to refuse to complete the contract. It was further provided that in the event the title was good and merchantable, "then SELLER shall be bound to deliver to PURCHASER a good and sufficient general warranty deed to the above land, ... and PURCHASER shall, upon delivery of said deed and bill of sale pay to SELLER the aforesaid cash consideration." Thus, there was more to the clos-

ing than cash by midnight because the seller had to first come up with a good and merchantable title and a warranty deed; the land was at the time under a lien to the Bank; the seller did not come forth with a warranty deed to obligate the buyer to perform. The seller argues that, upon receipt of the $174,000.00 in cash, he would pay off the lien and then provide a deed. The trial Court found that this was a local custom in closing loans. Such finding is erroneous as it conflicts with the provisions of an unambiguous contract. Also, actual cash was not required for compliance as that term is used in the contract. In *First Federal Savings & Loan Association v. Sharp*, 347 S.W.2d 337 (Tex.Civ.App.—Dallas 1961) *aff'd* 359 S.W.2d 902 (1962), the Court stated that in a sale of land, it would be unreasonable for a purchaser to be required to turn over large sums of money without receiving a deed representing the title to the proposed purchaser. The Court further stated that a "'cash sale' is a sale concurrent with delivery of the deed as distinguished from a sale where by agreement payment is deferred." The buyer in the case before us had a longstanding commitment with a lending agency which was known to all parties. On the night of August 31 prior to midnight, he arrived in Pecos with closing instructions for a $180,000.00 loan from his lender addressed to the local abstract company. He took the closing instructions to the abstract company the following morning, but it is undisputed that he arrived in Pecos with them before midnight. The closing instructions which were issued by the lender to the title company contained a request for a deed evidencing a first lien and deed of trust to secure the loan, stated that when an effective title policy was ready to be issued the lender would "give you drafting instructions, or wire the money to your account." A check in the amount of $9,000.00, five percent of the loan proceeds, was also enclosed. These instructions were in substantial conformity with the written contract of the parties as to how the deal would be closed. On the following morning, the buyer met with the seller and the seller agreed that they would meet at the abstract office on September 4, following the Labor Day weekend, and close the deal, although prior to that meeting the seller had mailed a letter to the buyer saying the contract was at an end. The seller did appear at the abstract office, however, on September 4 but, because the buyer did not bring the cash and he was not satisfied with the method of closing, he declined to do anything further. The buyer was not present at that time, but he had previously furnished the abstracter with the closing instructions from his lender, all as above noted. We conclude that the buyer was in substantial performance and not in default.

With the provisions for a "reasonable time" to cure title defects and the need to clear the title by securing a release of the lien, which a local attorney said sometimes took thirty days, it is obvious that time was not of the essence as found by the trial Court.

■ The trial Court erred in its findings and conclusions of law that the First National Bank of Pecos and D. B. Hardeman Cotton, Inc., both acted in good faith and as bona fide purchasers for value with good consideration. A bona fide purchaser is one who buys property in good faith for valuable consideration and without knowledge, actual or imputed, of outstanding claims in a third party or parties. *Houston Oil Company of Texas v. Hayden*, 104 Tex. 175, 135 S.W. 1149 (1911); *Socony Mobil Oil Corporation v. Belveal*, 430 S.W.2d 529 (Tex.Civ.App.—El Paso 1968, writ ref'd n. r. e.), *cert. denied* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76. The absence of actual or imputed knowledge is critical to the preservation of the bona fide purchaser's shield, cutting off the rights or equities of third parties. *Carter v. Converse*, 550 S.W.2d 322 (Tex.Civ.App.—Tyler 1977, writ ref'd n. r. e.). The crop loan of $28,000.00 was made after the Bank, knowing of the contract of the parties, had been shown a copy of the amendment to that contract, a copy of the closing instructions, and being told by the seller that he had not been paid. The Bank also relied on the fact that no one had requested a release of their lien so that the

contract could be closed. The Bank acted with knowledge of the amended contract, and the circumstances surrounding the failure to close the contract. At the time, there was nothing to show that the contract was in fact at an end, and the Bank acted with knowledge of such claims as the buyer had under the above described instruments. Also, the Bank had advanced the seller an additional $5,000.00 under its crop lien in January of 1980. At that time, this lawsuit was pending and the Bank had knowledge that title to the cotton crop was in litigation; if not actually, then through the doctrine of lis pendens. *Texas Water Rights Commission v. Crow Iron Works*, 582 S.W.2d 768 (Tex.1979). Under this doctrine, D. B. Hardeman Cotton, Inc., also had knowledge of the buyer's adverse claim. D. B. Hardeman Cotton, Inc., purchased after seeing an order of the Court denying a temporary injunction in a prior suit as to ownership of the cotton; the Court had granted a temporary restraining order but declined to make it into a temporary injunction. That order simply denied the buyer's request for a temporary injunction. It did not rule on the ownership of the cotton, and it did not end the lawsuit. The Court erred in finding that the Pecos State Bank and D. B. Hardeman Cotton, Inc., were bona fide purchasers for value. They are not entitled to the protection of that doctrine of law.

That portion of the judgment that the Plaintiff, R. J. Lefevere, should take nothing against the Defendants, James L. (Jabo) Sears, First National Bank of Pecos, and D. B. Hardeman Cotton, Inc., is reversed and remanded for another trial; and that portion of the judgment allowing the intervenor, Herb Blackstock, to recover from any sale of the cotton is affirmed.